UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ALTION MAYS, | ) | |
| | ) | |
| Plaintiff, | ) | 10 C 153 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| BNSF RAILWAY COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**M**EMORANDUM **O**PINION AND **O**RDER</u>

Altion Mays brought this suit against BNSF Railway Company under Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Doc. 1. Mays, an African-American, alleges

that BNSF required Rail Terminal Services ("RTS"), his employer and BNSF's subcontractor, to

implement a background check policy that had a disparate impact against African-Americans.

Doc. 30. BNSF has moved for summary judgment, and Mays has cross-moved for partial

summary judgment on two of BNSF's affirmative defenses. Docs. 90, 98. After the motions

were filed, the case was reassigned to the undersigned judge's calendar. Doc. 116. For the

following reasons, BNSF's motion is granted and Mays's motion is denied as moot.

**Background**

BNSF's motion will be considered first and, because it will be granted, last. The

following sets forth the material facts as favorably to Mays as the record and Local Rule 56.1

permit. *See In re United Air Lines, Inc.*, 453 F.3d 463, 468 (7th Cir. 2006) ("With cross

summary judgment motions, we construe all facts and inferences therefrom in favor of the party

against whom the motion under consideration is made.") (internal quotation marks omitted).

-1-

BNSF, a large freight rail transportation network, maintains an intermodal hub in

Corwith, Illinois.  Doc. 103 at ¶¶ 4-5.  BNSF contracts with several third-party service providers

to perform certain functions at Corwith and its other facilities.  *Id*. at ¶ 6.  One of the third-party

service providers, RTS, performed loading and unloading services at Corwith.  *Id*. at ¶ 7.  RTS

supplied the workforce for those services.  *Id*. at ¶ 8.  The relationship between RTS and BNSF

was governed by the Intermodal Services Agreement ("ISA").  *Id*. at ¶ 10.

The ISA provided that RTS was an independent contractor, that RTS's employees were

not subject to BNSF's direction, control, or supervision, and that RTS was responsible for the

employment, direction, and supervision of its own employees.  *Id*. at ¶¶ 12-13.  The ISA required

RTS to perform a background investigation of employees who would be working at Corwith,

including a review of their criminal records for the previous seven years.  *Id*. at ¶ 14.  RTS

employees who were convicted of larceny, theft, unlawful taking of another's property, or any

felony within that seven-year time period were not allowed to perform services at Corwith; the

ISA did not, however, require RTS to terminate such employees.  *Id*. at ¶¶ 15-16.  BNSF applies

the same criminal background policy to its own employees.  Doc. 104 at ¶ 74.  RTS had no

discretion when applying the background check policy.  *Id*. at ¶ 75.

RTS's hourly employees generally did not interact with BNSF employees at Corwith.

RTS would begin each shift with a briefing to discuss safety issues and to distribute work

assignments.  Doc. 103 at ¶ 19.  RTS had its own safety manual, though BNSF also required RTS

employees to follow numerous safety rules.  *Ibid*.  Besides BNSF's background check policy,

which as just noted prohibited RTS employees with certain criminal backgrounds from working

at Corwith but did not require RTS to hire or fire any employee, BNSF did not have input as to

RTS's hiring or firing decisions and did not perform human resources functions for RTS or its employees. *Id*. at ¶ 21.

RTS hired Mays as a spotter in or around July 2000 and assigned him to Corwith. *Id*. at ¶ 22. Mays never was employed by BNSF. *Id*. at ¶ 23. All of Mays's supervisors were RTS employees, and he received his work instructions and assignments from those supervisors. *Id*. at ¶¶ 25-26. If Mays had an issue with or a complaint concerning his employment, or a question regarding a work assignment, he would ask his RTS supervisors. *Id*. at ¶¶ 27-28. Mays received his scheduling information from RTS supervisors. *Id*. at ¶ 34. RTS kept track of Mays's attendance. *Id*. at ¶ 35. During his employment with RTS, Mays never received directions or instructions from a BNSF employee. *Id*. at ¶ 31. Any disciplinary notices were issued directly from RTS to Mays; Mays was never issued discipline by BNSF. *Id*. at ¶ 30. The trucks used by RTS employees had an RTS logo. *Id*. at ¶ 29. Mays's salary checks came from RTS, not BNSF. *Id*. at ¶ 32. RTS provided Mays's employment benefits. *Id*. at ¶ 33.

In 2003, Mays was convicted of a felony, the illegal sale of a handgun. *Id*. at ¶ 37. As a result, and pursuant to the ISA, Mays was not allowed to enter onto BNSF property at the Corwith yard and was advised as such by his RTS supervisors. *Id*. at ¶ 32. RTS did not offer Mays a position at an alternative site, and he never again worked for RTS. *Id*. at ¶ 39.

After RTS informed him that he could no longer work at Corwith, Mays filed a charge of discrimination against BNSF with the Equal Employment Opportunity Commission ("EEOC"). Doc. 30-1. The EEOC issued Mays a right to sue letter. Doc. 30-2. Mays also filed an EEOC charge against RTS, and he and three colleagues eventually brought suit against RTS. Doc. 103

at ¶ 40; Doc. 92-10 at 2-10; *see Salter v. Rail Terminal Servs.*, No. 05 C 301 (N.D. Ill.). Mays

settled that suit and received settlement payments from RTS. Doc. 103 at ¶ 40; Doc. 92-10 at 13.

### Discussion

BNSF's motion seeks summary judgment on several grounds. To resolve the motion, it is

necessary to address only BNSF's argument that because it was not Mays's employer, Title VII

does not permit Mays to bring his claim against it.

Title VII makes it unlawful:

> for an employer–
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to
> discriminate against any individual with respect to his compensation, terms,
> conditions, or privileges of employment, because of such individual's race,
> color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for
> employment in any way which would deprive or tend to deprive any
> individual of employment opportunities or otherwise adversely affect his
> status as an employee, because of such individual's race, color, religion,
> sex, or national origin.

42 U.S.C. § 2000e-2(a). Subsection (a)(1) prohibits disparate treatment, while subsection (a)(2)

prohibits employment practices that result in a disparate impact against a protected group. *See*

*Lewis v. City of Chicago*, 130 S. Ct. 2191, 2197 (2010); *Connecticut v. Teal*, 457 U.S. 440, 448

(1982); *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971). Only an "employer" can be held

liable under Title VII, and BNSF, which has more than fifteen employees, indisputably is *an*

employer. *See* 42 U.S.C. § 2000e(b) (defining "employer" as any person "engaged in an industry

affecting commerce who has fifteen or more employees"). BNSF argues, however, that it was

not *Mays's* employer—in other words, that Mays was not *its* employee. Title VII circularly

defines "employee" as "an individual employed by an employer." 42 U.S.C. § 2000e(f).

-4-

Mays concedes that RTS, not BNSF, was his employer. Doc. 103 at ¶¶ 22-23. He seeks refuge, however, in the "interference" theory of Title VII, which provides that an employee (Mays) of Employer X (RTS) may sue Employer Y (BNSF) under Title VII on the ground that Employer Y's alleged discriminatory conduct (the background check policy that BNSF required of its contractors) interfered with his employment with Employer X. Doc. 102 at 3-7.

The decision most closely associated with the interference theory is *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C. Cir. 1973). The plaintiff in *Sibley* was a male nurse who worked directly for patients in private hospitals; he claimed that the defendant hospital, which was not his employer, had violated subsection (a)(1), the disparate treatment provision, by refusing to refer him to female patients and preventing him from reporting to female patients. *Id*. at 1339-40. In holding that the plaintiff could proceed with his suit even though the hospital was not his employer, *Sibley* first invoked the policy underlying Title VII, stating: "To permit a covered employer to exploit circumstances peculiarly affording it that capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment with respect to employment in its own service, would be to condone continued use of the very criteria for employment that Congress prohibited." *Id*. at 1341. *Sibley* also observed that the text of subsection (a)(1) prohibited discrimination against "any individual," as opposed to "any employee." *Ibid*. This aspect of the statutory text prompted the D.C. Circuit to remark that there was no "good reason to confine the meaning of 'any individual' to include only former employees and applicants for employment, in addition to present employees." *Ibid*. Finally, *Sibley* noted that Title VII prohibited discrimination not just by employers, but also by labor unions and employment

agencies. *See* 42 U.S.C. § 2000e-2(b), (c). From this aspect of Title VII, the D.C. Circuit drew this lesson:

> We think it significant that the Act has addressed itself directly to the problems of interference with the direct employment relationship by labor unions and employment agencies—institutions which have not a remote but a highly visible nexus with the creation and continuance of direct employment relationships between third parties. On the facts as alleged, although not yet proved, [the hospital] is so circumstanced, and its daily operations are of such a character as to have such a nexus to the third parties in this case; and we think neither the spirit nor, more essentially, the language of the Act leave it outside the reach of Title VII.

488 F.2d at 1342.

The Ninth and Eleventh Circuits have adopted *Sibley*'s interference theory. *See Zaklama v. Mt. Sinai Med. Ctr.*, 842 F.2d 291, 294 (11th Cir. 1988); *Gomez v. Alexian Bros. Hosp.*, 698 F.3d 1019, 1021-22 (9th Cir. 1983). The First and Second Circuits have rejected *Sibley*. *See Lopez v. Massachusetts*, 588 F.3d 69, 89 (1st Cir. 2009) ("The interference theory has no basis in our circuit law, has never been adopted by this circuit, and contradicts Supreme Court case law. We flatly reject it now."); *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 374 (2d Cir. 2006) ("We disagree with the *Sibley* court's expansive approach to interpreting the straightforward language of [Title VII].").

In rejecting *Sibley*, the Second Circuit held that "[a]n expansive definition of 'employer' contravenes Supreme Court precedent and fundamental canons of statutory interpretation." *Gulino*, 460 F.3d at 374. According to the Second Circuit, a "natural reading" of Title VII "suggests that the 'individual' it references is a potential, current, or past employee of the employer." *Ibid*. (internal quotation marks omitted). The Second Circuit added:

> *Sibley*'s central reason for creating "interference" liability under Title VII was that Congress intended a comprehensive solution to employment

-6-

discrimination and that such a comprehensive solution must entail an expansive view of potentially liable parties. As evidence of this intent, the *Sibley* court cited the sections of Title VII that extend "interference" liability to employment agencies and labor unions based upon a "highly visible nexus with the creation and continuance of direct employment relationships between third parties." The court concluded that, because the defendant's "daily operations are of such a character as to have such a nexus," liability was properly extended to that defendant.

This reading of Title VII, however, ignores the very language that Congress employed. Congress did not mention labor unions or employment agencies as *examples* of additional potentially liable parties under Title VII. Nor did Congress extend Title VII liability in a general way; rather, it limited the statute's additional liability to labor unions and employment agencies. *Cf. O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86 (1994) (holding that federal statutory scheme detailing what claims could be made against the FDIC when it is acting as receiver necessarily excluded claims not mentioned in the statute). Congress obviously considered a range of potentially liable parties apart from traditional common-law employers, and in so doing, decided that only these two additional groups would be included within the reach of Title VII. Absent some evidence that Congress intended otherwise, we conclude that all other parties with a similar "nexus" to a plaintiff's employment are excluded from the Title VII liability scheme. *See United States v. Smith*, 499 U.S. 160, 167 (1991) ("Where Congress explicitly enumerates certain exceptions … additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent."); *Greene v. United States*, 79 F.3d 1348, 1355 (2d Cir.1996) ("The ancient maxim *expressio unius est exclusio alterius* (mention of one impliedly excludes others) cautions us against engrafting an additional exception to what is an already complex [statutory scheme].").  For the courts "[t]o create additional 'federal common-law' [types of liability] is not to 'supplement' this scheme, but to alter it." *O'Melveny & Myers*, 512 U.S. at 87.

*Id*. at 374-75 (footnote and some internal citations omitted) (alterations in original). The Second

Circuit concluded that Title VII applies only when there is an "employer-employee relationship"

as "understood by common-law agency doctrine." *Id*. at 370-71 (internal quotation marks

omitted). The First Circuit reached the same conclusion. *See Lopez*, 588 F.3d at 89 ("The

interference theory is entirely inconsistent with the use of the common law criteria the Supreme

Court has identified. Further, the conceptual underpinning for the doctrine, that a broad reading of the terms 'employee' and 'employer' are supposedly justified by the remedial purpose of the statute, has been expressly rejected by the Supreme Court.").

In justifying their rejection of the *Sibley* interference theory, the First and Second Circuits invoked post-*Sibley* Supreme Court decisions holding that where, as in Title VII, the statutory text does not provide clear guidance as to when an employer-employee relationship exists for the purpose of determining whether the statute applies, the common law agency test governs. *See Lopez*, 588 F.3d at 83-86; *Gulino*, 460 F.3d at 370-72. In *Nationwide Mutual Insurance Co. v. Darden*, 503 U.S. 318, 323 (1992), for example, the Supreme Court held that ERISA's definition of an "employee," which is materially identical to Title VII's definition, was "completely circular and explains nothing," and thus that ERISA required "a common-law test for determining who qualifies as an 'employee.'" *Id.* at 323; *compare* 29 U.S.C. § 1002(6) (defining "employee" as "any individual employed by an employer") *with* 42 U.S.C. § 2000e(f) (defining "employee" as "an individual employed by an employer"). *Darden* added more generally that "Congress means an agency law definition of 'employee' unless it clearly indicates otherwise." 503 U.S. at 325. Likewise, in *Clackamas Gastroenterology Associates., P.C. v. Wells*, 538 U.S. 440 (2003), a case brought under the Americans with Disabilities Act ("ADA"), the Court held that "when Congress has used the term 'employee' without defining it, we have concluded that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine." *Id.* at 445 (internal quotation marks omitted). And in *Walters v. Metropolitan Educational Enterprises, Inc.*, 519 U.S. 202 (1997), the Court held that the crucial inquiry in determining whether an employer satisfies Title VII's threshold for coverage is whether it has an

"employment relationship" under "traditional principles of agency law" with "15 or more individuals for each working day in 20 or more weeks during the year." *Id*. at 211-12.

    *Sibley* has traveled a winding path in the Seventh Circuit. In *Doe v. St. Joseph's Hospital of Fort Wayne*, 788 F.2d 411 (7th Cir. 1986), the court relied on *Sibley* in holding on a Rule 12(b)(6) motion that the plaintiff could sue the defendant hospital under Title VII even though she was the hospital's independent contractor and not its employee. *See id*. at 422-25. However, in *EEOC v. State of Illinois*, 69 F.3d 167 (7th Cir. 1995), the court cast serious doubt on *Doe* and *Sibley*, suggesting that a plaintiff may sue a defendant under Title VII only if they had an actual or de facto employment relationship:

> We'll call [the plaintiff's] theory the "interference" theory, or aiding and abetting, though the parties do not use the latter term.
>
> We think it very doubtful that laws which forbid employers to discriminate create a blanket liability to employees of *other* employers for interference with *their* employment relationships. It might be a good idea to impose liability on those who aid or abet violations of those laws, but what sense would it make to confine that liability to persons or firms that happen to be employers? Since it would make very little sense that we can see … we find it implausible to impute to Congress an intention to create, by language not at all suggestive of any such intention, aider and abettor liability of one employer to the employees of another employer.
>
> We are mindful that a number of Title VII cases, beginning with *Sibley* …, could perhaps be cited in support of such liability, including our own *Doe* …. But the cases in question are ones in which the defendant so far controlled the plaintiff's employment relationship that it was appropriate to regard the defendant as the de facto or indirect employer of the plaintiff, as where a hospital prevents a nurse from being employed by a hospitalized patient. Indirect employment is a more limited theory of liability than aiding and abetting.

*Id*. at 169 (internal citations omitted). But the Seventh Circuit stopped short of definitively rejecting the interference theory, and instead resolved the case on other grounds. *Ibid*.

A year later, in *Alexander v. Rush North Shore Medical Center*, 101 F.3d 487 (7th Cir.

1996), the Seventh Circuit formally overruled *Doe*, holding that "independent contractors are not

protected by Title VII." *Id*. at 492 (internal quotation marks and alterations omitted). In a

footnote, however, *Alexander* declined to pass judgment on the interference theory as a whole:

> It is important to note that our ruling today is limited to overturning *Doe*'s
> holding that a physician may bring a Title VII action against a hospital even
> though he is an independent contractor and not an employee. We have no
> occasion to go further and determine if a Title VII plaintiff must always
> demonstrate that he is an employee *of the defendant employer*. Thus, we
> continue to leave open the question that went unanswered in *Shrock*[ *v.
> Altru Nurses Registry*, 810 F.2d 658, 660 (7th Cir. 1987)]—*i.e.*, whether an
> employee of employer *X* may bring a Title VII action against employer *Y*
> when *Y* is not his employer, but merely someone whose discriminatory
> conduct interferes with his employment with employer *X*.

*Id*. at 493 n.2. In *Shrock*, the decision cited by *Alexander*, the Seventh Circuit had found it

unnecessary to "decide when, if ever, an employer covered by the statute can be held liable for

conduct toward someone who is not its employee." 810 F.2d at 660.

The Seventh Circuit has not definitively resolved the question left open by *Alexander*. At

least one decision from this District interpreted *EEOC v. Illinois* as repudiating Title VII

interference liability. *See Kerr v. WGN Cont'l Broad. Co.*, 229 F. Supp. 2d 880, 887 (N.D. Ill.

2002) ("In light of Judge Posner's analysis of interference/aider and abettor liability in *EEOC v.

State of Illinois*, this court concludes that such a theory is unavailable in a Title VII action."); *see

also Bender v. Suburban Hosp., Inc.*, 159 F.3d 186, 188 n.1 (4th Cir. 1998) ("[t]he Seventh

Circuit, although initially following *Sibley* completely [in *Doe*], has since suggested that, if given

a chance to reconsider, it would narrow the scope of *Sibley* liability, at least by requiring the

plaintiff to demonstrate … a 'de facto' or 'indirect' employment relationship with the

defendant") (citing *EEOC v. State of Illinois*, 69 F.3d at 169); *Abbott v. Vill. of Westmont*, 2003

WL 22071492, at *7 n.4 (N.D. Ill. Sept. 5, 2003) ("The Seventh Circuit has strongly implied [in *EEOC v. Illinois*], but not yet decided, that [a *Sibley* interference] theory would not be allowed under federal antidiscrimination laws."). By contrast, in *EEOC v. Foster Wheeler Constructors, Inc.*, 1999 WL 515524 (N.D. Ill. July 14, 1999), the court adhered to *Sibley* in a subsection (a)(1) disparate treatment case, relying like *Sibley* on subsection (a)(1)'s use of the term "individual" rather than "employee." *Id*. at *10.

The Seventh Circuit has not expressly addressed the interference theory in the seventeen years since *Alexander* was issued. *Cf. Flowers v. Columbia Coll. Chi.*, 397 F.3d 532, 534 (7th Cir. 2005) (citing *EEOC v. Illinois* and *Sibley* in discussing a joint employer issue in dicta). But during that time, the court has consistently invoked and applied the common law agency test in employment discrimination cases to determine whether the plaintiff was the defendant's employer. In *Denton v. Chicago Transit Authority*, 400 F. App'x 90 (7th Cir. 2010), the Seventh Circuit considered whether the ADA plaintiff was employed by the defendant at the time the alleged violation took place. Citing the Supreme Court's *Clackamas Gastroenterology Associates* decision and the First Circuit's *Lopez* decision, the Seventh Circuit held: "Because the statute does not specifically define the circumstances constituting the employer-employee relationship, courts look to either the express agreement of the parties or to common-law principles of agency." *Id*. at 92. A similar issue was presented by *EEOC v. North Knox School Corp.*, 154 F.3d 744 (7th Cir. 1998), a case brought under the Age Discrimination in Employment Act ("ADEA"), which presented the question whether the charging parties were the defendant's employees or, rather, its independent contractors. Observing that "[t]he ADEA, like Title VII and ERISA, does not further define 'employee,'" the Seventh Circuit applied the

common law agency test to determine whether the defendant was the charging parties' employer. *Id*. at 747-51.

Given all of the foregoing—*Sibley*'s near-death experience in the Seventh Circuit, post-*Sibley* Supreme Court decisions directing courts to use common law agency principles when determining whether the defendant was the plaintiff's employer and thus whether the plaintiff had a viable claim against the defendant under the statute in question, and the Seventh Circuit's post-*Alexander* adherence to those precedents—it would not be unreasonable to predict that the Seventh Circuit would definitively reject the interference theory under Title VII if squarely presented with that question. There is no need to go that far here, however, as the case may be resolved on either of two narrower grounds.

The first ground is that Mays cannot invoke the interference theory against BNSF as that theory has come to be understood by the D.C. Circuit, the court that ushered it into the jurisprudence forty years ago in *Sibley*. In *Redd v. Summers*, 232 F.3d 933 (D.C. Cir. 2000), the plaintiff was employed by Aspen Personnel Services, which had been retained by the Treasury Department's Bureau of Engraving and Printing to provide tour services at the Bureau. *Id*. at 936. The plaintiff worked for Aspen as a tour guide at the Bureau; Aspen dismissed the plaintiff; after the plaintiff complained, Aspen rehired her and attempted to reinstate her at the Bureau; and the Bureau refused. *Id*. at 936-37. The plaintiff then sued the Bureau, alleging that it was the moving force behind her termination and that the termination arose from discrimination in violation of § 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791, which bars employment discrimination against individuals with disabilities employed by the federal government. 232 F.3d at 936. The Bureau defended on the ground that it was not the plaintiff's employer and thus

could not be held liable under § 501. *Ibid.* Applying a test resembling the common law agency test, the D.C. Circuit held that the Bureau was not the plaintiff's employer. *Id.* at 938-40.

The D.C. Circuit then addressed the plaintiff's argument that the Bureau, even if not her employer, was subject to suit under *Sibley*. The court described *Sibley* as holding "that even though the hospital did not directly employ the male nurse, it could be liable for employment discrimination because it had used its control of access to potential employers to deny him significant employment opportunities." *Id.* at 940-41. Given this understanding of *Sibley*'s scope, the D.C. Circuit rejected the plaintiff's submission that *Sibley* controlled her claim:

> [T]he *Sibley* structure is absent here. In screening guides supplied by Aspen, the Bureau was simply a consumer of Aspen's services, not an intermediary between would-be guides and services that might employ them. [The plaintiff's] proposed extension of *Sibley* would produce a result Congress certainly did not intend—consumers would be liable under civil rights laws for their race, gender, age and disability-based preferences. The *Sibley* decision would be on point if the court had found a female patient liable for rejecting the services of a male nurse, but it plainly did not.

*Id.* at 941. Thus, according to the D.C. Circuit, *Sibley* applies only where the defendant, although not the plaintiff's employer, is an "intermediary" between the plaintiff and her employer, and the decision does not apply where the defendant is merely a "consumer" of "services" provided by the plaintiff's employer. *See Gulino*, 460 F.3d at 377 n.17 ("We also note that the sweep of *Sibley* itself was curtailed in [*Redd*], in which the D.C. Circuit seemed to limit *Sibley* to situations where the alleged employer acts as 'an intermediary between [people offering services] and [potential employers].'") (quoting *Redd*, 232 F.3d at 941) (Second Circuit's alterations).

The relationship among the plaintiff, her employer, and the defendant in *Redd* is materially identical to the relationship among the relevant players here: the defendant (BNSF, the Bureau) retained the plaintiff's employer (RTS, Aspen) to perform certain functions on the

-13-

defendant's premises; the defendant was alleged to be responsible for the plaintiff's not being

permitted to work at the defendant's facility; and the plaintiff brought a discrimination suit

against the defendant. Like the Bureau in *Redd*, BNSF was simply a "consumer" of RTS's

services, not an "intermediary" between Mays and RTS. Under the rationale of *Redd*, then, Mays

cannot proceed against BNSF on a *Sibley* interference theory. That dooms Mays's Title VII

claim against BNSF. Although *Redd* is not binding precedent in this District, it is difficult to

imagine that the Seventh Circuit, which seems poised to reject the interference theory entirely,

would give the theory a broader sweep than the D.C. Circuit.

The second reason why Mays's claim fails under *Sibley*, offered in addition to the first, is

that the interference theory applies only to subsection (a)(1) disparate treatment cases, not to

subsection (a)(2) disparate impact cases. *Sibley* was a disparate treatment case, as was *Foster

Wheeler*. Both decisions invoked the text of subsection (a)(1) in accepting the interference

theory. And as far as the statutory text is concerned, their rationale is reasonable. Recall that

subsection (a)(1) makes it unlawful for an employer "to fail or refuse to hire or to discharge *any*

*individual*, or otherwise to discriminate against *any individual* with respect to his compensation,

terms, conditions, or privileges of employment, because of *such individual's* race, color, religion,

sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). Subsection (a)(1)

prohibits discrimination against "any individual"; nowhere does the provision even mention the

words "employee" or "applicant," let alone limit its protective scope to the employer's

employees and applicants. It is not unreasonable to conclude from this aspect of the statutory

text that subsection (a)(1) allows non-employees of an employer to sue the employer—meaning

that an employee of Employer X may sue Employer Y for interfering with his employment with

-14-

Employer X even though Employer Y is not his employer. *Cf. District of Columbia v. Heller*, 554 U.S. 570, 579-81 (2008) (holding that the scope of the Second Amendment right should not be limited to the "militia" referenced in the Amendment's prefatory clause, given that the operative clause grants rights to "the people," which encompasses both the militia and others not in the militia).

This rationale, whatever its merits, does not work with subsection (a)(2). That provision makes it unlawful for an employer "to limit, segregate, or classify ***his** employees or applicants for employment* in any way which would deprive or tend to deprive *any individual* of employment opportunities or *otherwise adversely affect his status as an employee*, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(2) (emphasis added). While subsection (a)(1) prohibits "discriminat[ion] against *any individual*," subsection (a)(2) prohibits an employer from conduct that would "limit, segregate, or classify *his employees or applicants for employment*." The use of the phrase "*his* employees or applicants" is significant; it expressly limits subsection (a)(2)'s prohibitory scope to actions that an employer takes with respect to *its* employees and applicants. The text leaves no room for subsection (a)(2) to allow, as subsection (a)(1) has been read to allow, suits to be brought by persons other than the employer's employees and applicants. *See Bd. of Trs. of Leland Stanford Jr. Univ. v. Roche Molecular Sys.*, 131 S. Ct. 2188, 2196 (2011) (noting the "general reluctance to treat statutory terms as surplusage") (internal quotation marks and alterations omitted); *Clay v. United States*, 537 U.S. 522, 528-29 (2003) ("When 'Congress includes particular language in one section of a statute but omits it in another section of the same Act,' we have recognized, 'it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or

exclusion.'") (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).  That subsection (a)(1) might allow certain claims not allowed by subsection (a)(2) is an appropriate reading where, as here, the reading follows from the statutory text.  *See Lewis*, 130 S. Ct. at 2199-2200 ("But even if the two theories [disparate treatment and disparate impact] were directed at the same evil, it would not follow that their reach is therefore coextensive.  If the effect of applying Title VII's text is that some claims that would be doomed under one theory will survive under the other, that is the product of the law Congress has written.  It is not for us to rewrite the statute so that it covers only what we think is necessary to achieve what we think Congress really intended.").

It is true that subsection (a)(2) includes the phrase "any individual."  In the context of subsection (a)(2), however, that phrase is limited to the employer's applicants and employees.  The "any individual" protected by subsection (a)(2) is somebody adversely affected by an employer's "limit[ing], segregat[ing], or classify[ing] his employees or applicants for employment," with the adverse action consisting of "depriv[ing] or tend[ing] to deprive" that individual "of employment opportunities or otherwise adversely affect[ing] his status as an employee."  The adverse effect is on the individual's "status as an employee," and the provision's description of the cause of that adverse effect—"limit[ing], segregat[ing], or classify[ing] his employees or applicants"—makes sense only if "status as an employee" refers to the individual's status as an employee (or applicant) of the employer.  It follows that the only "employment opportunities" and "status as an employee" that can be adversely affected by an employer's "limit[ing], segregat[ing], or classify[ing] his employees or applicants for employment" are those belonging to the employer's own employees and applicants.  Those are the only "individuals" protected by subsection (a)(2).

-16-

This reading of the term "any individual" in subsection (a)(2) finds support in *Smith v. City of Jackson*, 544 U.S. 228 (2005). The question presented in *Smith* was whether the analog to Title VII's subsection (a)(2) in the ADEA, 29 U.S.C. § 623(a)(2), recognizes disparate impact claims. The plurality, consisting of Justices Stevens, Souter, Ginsburg, and Breyer, held that it does; Justice Scalia concurred in the judgment, agreeing with the plurality's conclusion but preferring to rest the judgment on deference to the EEOC's interpretation of the provision rather than on an independent statutory analysis; and Justice O'Connor, joined by Justices Kennedy and Thomas, also concurring in the judgment, argued that the ADEA's subsection (a)(2) does not recognize disparate impact claims. Significant for present purposes, both the plurality and Justice O'Connor's concurrence described the ADEA's subsection (a)(2), which is identical in all material respects to Title VII's subsection (a)(2), as protecting the employer's employees, period. To support its interpretation, the plurality noted "an incongruity" in subsection (a)(2) "between the employer's actions—which are focused on his employees generally—and *the individual employee* who adversely suffers because of those actions." 544 U.S. at 236 n.6 (emphasis added). The plurality added that "an employer who classifies his employees without respect to age may still be liable under the terms of this paragraph if such classification *adversely affects the employee* because of *that employee's* age—the very definition of disparate impact." *Ibid*. (emphasis added). In disagreeing with the plurality's interpretation, Justice O'Connor's concurrence noted that the ADEA's subsection (a)(2) "forbids an employer to limit, segregate, or classify his employees if that decision is taken because of *even one* employee's age and *that individual* (alone or together with others) is harmed." *Id*. at 251 (emphasis in the original). Both opinions treat the term "any individual" as synonymous with an "employee" of the employer,

which, for the reasons given in the preceding paragraph, is the best and likely only possibly way

to read the provision. "Although the Court did not grant certiorari in [*Smith*] to [determine

whether an interference theory is viable under the ADEA's subsection (a)(2)] and did not

produce a holding on that subject, the Justices' understanding confirms that the [court's

interpretation of term 'any individual' is correct]." *United States v. Spears*, __ F.3d __, 2013 WL

4774514, at *1 (7th Cir. Sept. 6, 2013 ) (en banc).

Accordingly, for either or both of these reasons, Mays cannot proceed against BNSF on a

*Sibley* interference theory. In so holding, the court notes parenthetically that interference claims

may be brought under 42 U.S.C. § 1981. *See Daniels v. Pipefitters' Ass'n Local Union No. 597*,

945 F.2d 906, 914 (7th Cir. 1991) (allowing a § 1981 interference claim against a third party

because "[t]o hold otherwise would impose a sort of § 1981 privity of contract requirement that

would effectively protect third parties … from § 1981 liability"); *Shirkey v. Eastwind Cmty. Dev.*

*Corp.*, 941 F. Supp. 567, 573 (D. Md. 1996) ("§ 1981 has been applied when there is no direct

employer/employee relationship but where the discriminating entity interfered with the plaintiff's

ability to enter into an employment contract on the basis of race"). Mays, however, cannot take

advantage of § 1981 because it recognizes only disparate treatment claims. *See Franklin v. City*

*of Evanston*, 384 F.3d 838, 848 (7th Cir. 2004) ("[A]s previously noted, equal protection claims,

like § 1981 claims, require a showing of discriminatory treatment and cannot be supported by

proof of disparate impact. Thus, Franklin fails as a matter of law to make out a prima facie case

for a violation of § 1981 based on a claim of disparate impact.").

Because Mays may not invoke the interference theory, he can survive summary judgment

only if a reasonable jury could find on this record that BNSF was his employer under common

-18-

law agency principles or under a joint employer theory.  *See Denton*, 400 F. App'x at 92; *N. Knox Sch. Corp.*, 154 F.3d at 747-51; *Lopez*, 588 F.3d at 83-86; *Gulino*, 460 F.3d at 370-72.

Mays makes no such argument in his response brief, Doc. 102, which operates as a forfeiture given that BNSF argued in its initial brief it was not Mays's employer under either the common law agency test or a joint employer theory, Doc. 91 at 11-14.  *See Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 386 (7th Cir. 2012); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011); *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 407-08 (7th Cir. 2007) ("We agree with the district court's determination that [the plaintiff] waived (forfeited would be the better term) his discrimination claim by devoting only a skeletal argument in response to Cracker Barrel's motion for summary judgment."), *aff'd on other grounds*, 553 U.S. 442 (2008).  Indeed, Mays affirmatively waived any argument that BNSF was his employer by admitting that he "was never employed by BNSF."  Doc. 103 at ¶ 23; *see United States v. Hite*, 418 F. App'x 546, 547 (7th Cir. 2011) ("On appeal Hite argues that, by refusing to recommend that the district court sentence him below the statutory minimum, the government breached the plea agreement.  Hite's problem, of course, is that he waived this contention when he conceded to the district court … that the government had *not* breached its agreement.").

Even putting aside forfeiture and waiver, Mays would lose on the merits because the undisputed facts make clear that BNSF was not his employer under common law agency principles or the joint employer test.  The Seventh Circuit has held that the common law test turns on five factors: "(1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace, (3) responsibility

for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations." *Alexander*, 101 F.3d at 492; *see also Hojnacki v. Klein-Acosta*, 285 F.3d 544, 549-50 (7th Cir. 2002).  The Seventh Circuit added that of the "several factors to be considered, the employer's right to control is the most important when determining whether an individual is an employee or an independent contractor." *Alexander*, 101 F.3d at 492-93; *see also Hojnacki*, 285 F.3d at 550.  Similarly, "[t]he joint employer concept … looks to the control two separate companies exert over the same employee." *NLRB v. W. Temp. Servs., Inc.*, 821 F.2d 1258, 1266 (7th Cir. 1987); *see also Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964); *DiMucci Constr. Co. v. NLRB*, 24 F.3d 949, 952 (7th Cir. 1994) ("DiMucci, Wheeling and Semi could be considered joint employers if DiMucci and Wheeling exerted significant control over Semi's employees.").  "Factors to consider in determining joint employer status are (1) supervision of employees' day-to-day activities; (2) authority to hire or fire employees; (3) promulgation of work rules and conditions of employment; (4) issuance of work assignments; and (5) issuance of operating instructions." *DiMucci Constr.*, 24 F.3d at 952.

Because Mays did not develop an argument on either test, the record does not speak to some of the relevant factors.  To the extent the record does speak to the relevant factors, particularly the control and supervision factor, it would not permit a reasonable jury to find for Mays on either the common law agency test or the joint employer test.  The record indisputably shows the following:

- Under its agreement with BNSF, RTS was responsible for the employment, direction, and supervision of its employees, and RTS's employees were not subject to BNSF's direction, control, or supervision.

- Mays's supervisors were RTS employees, and he received his work instructions and assignments from RTS supervisors.

- If Mays had an issue with or a complaint concerning his employment, or a question regarding a work assignment, he would contact his RTS supervisors.

- Mays received his scheduling information from RTS supervisors, and RTS kept track of Mays's attendance.

- During his employment with RTS, Mays never received directions or instructions from a BNSF employee.

- Any disciplinary notices were issued directly from RTS to Mays, and Mays was never issued discipline by BNSF.

- Mays received his salary and benefits from RTS, not BNSF.

- BNSF did not perform human resources functions for RTS or its employees, and did not direct RTS to hire or fire its own employees.

- RTS's hourly employees generally did not interact with BNSF employees at the Corwith yard.

- RTS would begin each shift with a briefing to discuss any safety issues and handing out work assignments to its employees.

BNSF's lack of supervision and control over Mays requires the conclusion that BNSF was not his employer or joint employer. *See Hojnacki*, 285 F.3d at 550-52 (affirming summary judgment for the defendant where the last four *Alexander* factors were inconclusive, but where the first factor, lack of control, weighed heavily towards the defendant); *Lopez*, 588 F.3d at 85-86 (holding that the defendant was not the plaintiffs' employer because the defendant "affect[ed] plaintiffs only indirectly and only to the degree that plaintiffs' local employers decide to involve [the defendant] in various processes," because the defendant could not "assign plaintiffs any projects" or "set the hours of plaintiffs' employment," and because the defendant did not provide benefits or consider the plaintiffs to be its employees for tax purposes); *Rivas v. Federacion de*

*Asociaciones Pecuarias de Puerto Rico*, 929 F.2d 814, 821 (1st Cir. 1991) (holding that the

ADEA defendant was not the plaintiffs' employer because its control was limited to "setting the

time that its ships were to be unloaded, … some work-site disciplinary authority, and [directing]

the order of what was to be unloaded first," while the plaintiffs' actual employer "furnish[ed],"

"selected," "scheduled," and supervis[ed]" the plaintiffs).

### Conclusion

For the foregoing reasons, BNSF's motion for summary judgment is granted.  Because

Mays's motion for partial summary judgment addresses two of BNSF's affirmative defenses, and

because those affirmative defenses are moot in light of the grant of summary judgment to BNSF,

Mays's motion is denied as moot.  Judgment will be entered in favor of BNSF and against Mays.

September 9, 2013                                    _____
                                                              United States District Judge